# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

ATHENE LIFE AND ANNUITY )
COMPANY, AMERICAN INVESTORS )
LIFE INSURANCE COMPANY, INC. )
REVOCABLE TRUST, and )
INDIANAPOLIS LIFE INSURANCE )
COMPANY REVOCABLE TRUST, )
)
                      Plaintiffs, )
)
    v. )    **C.A. No. N19C-10-055**
)              **PRW CCLD**
AMERICAN GENERAL LIFE )
INSURANCE COMPANY, ZC )
RESOURCE INVESTMENT TRUST, )
and ZC RESOURCE LLC, )
)
                     Defendants. )

Submitted: February 18, 2020
Decided: May 18, 2020

## <u>MEMORANDUM OPINION AND ORDER</u>

*Upon Defendants ZC Resource Investment Trust and ZC Resource LLC's
Motion to Dismiss,*
**GRANTED** in part; **DENIED** in part.

*Upon Defendant American General Life Insurance Company's
Motion to Dismiss and Joinder,*
**GRANTED** in part; **DENIED** in part.

Martin S. Lessner, Esquire, Richard J. Thomas, Esquire, M. Paige Valeski, Esquire, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; James P. Gillespie, Esquire (argued), Dustin Hillsley, Esquire, KIRKLAND & ELLIS LLP, New York, New York; and Adam T. Humann, Esquire, KIRKLAND & ELLIS LLP, Washington, D.C., *Attorneys for Plaintiff Athene Annuity and Life Company.*

Brian C. Ralston, Esquire, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware, *Attorney for Plaintiffs American Investors Life Insurance Company Revocable Trust and Indianapolis Life Insurance Company Revocable Trust.*

Kenneth J. Nachbar, Esquire, Sabrina M. Hendershot, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, *Attorneys for Defendant American General Life Insurance Company.*

Joel Friedlander, Esquire, Christopher P. Quinn, Esquire, FRIEDLANDER & GORRIS, P.A, Wilmington, Delaware; John L. Jacobus, Esquire (argued), J. Walker Johnson, Esquire, Catherine D. Cockerham, Esquire, William Carson, Esquire, STEPTOE & JOHNSON LLP, Washington, D.C.; Jeffrey B. Korn, Esquire, Stuart R. Lombardi, Esquire, WILLKIE FARR & GALLAGHER LLP, Washington, D.C.; Joseph G. Davis, Esquire, WILLKIE FARR & GALLAGHER LLP, New York, New York, *Attorneys for Defendants ZC Resource Investment Trust and ZC Resource LLC.*

**WALLACE, J.**

This dispute arises over the interpretation of two corporate-owned life insurance policies (the "Policies") and the relevant tax laws. Plaintiffs Athene Life and Annuity Company ("Athene"), American Investors Life Insurance Company, Inc. Revocable Trust ("American Investors"), and Indianapolis Life Insurance Company Revocable Trust ("IndyLife") (collectively, "Plaintiffs") originally brought suit in the Court of Chancery seeking damages for breach of contract and tortious interference, specific performance, declaratory judgment, and injunctive relief. Specifically, Plaintiffs allege Defendant American General Life Insurance Company, Inc. ("American General") breached its obligations arising under the Policies. Plaintiffs further allege tortious interference against Defendants ZC Resource Investment Trust ("ZCRIT") and ZC Resource LLC ("ZC Resource") (together with ZCRIT, "ZC Defendants") (together with ZCRIT and American General, "Defendants"). The Court of Chancery found it lacked subject matter jurisdiction and the action should be transferred to this Court for Plaintiffs to seek the proper and adequate remedy at law.[1]

Before the Court is ZC Defendants' Motion to Dismiss Plaintiffs' Complaint. Forwarding the same facts, grounds, and arguments, American General adopts and joins in ZC Defendants' dismissal motion on all but the Complaint's tortious interference count, because American General wasn't named in that count.

---

[1] *See* DEL. CODE ANN. tit. 10, § 1902 (2019).

-1-

Plaintiffs' Complaint alleges that Defendants' unilateral implementation of certain amendments to the Policies has harmed Athene by: (1) reducing death benefits paid under the Policies, (2) eliminating specified returns guaranteed in certain transaction documents, and (3) effectively foreclosing Athene from exiting the Policies by reallocation. That is, Plaintiffs' Complaint:

- Charges Breach of Contract and seeks Specific Performance against American General ("Count 1");

- Seeks Injunctive Relief and Declaratory Judgment against all Defendants ("Count 2");

- Charges Tortious Interference with Contract against ZC Defendants ("Count 3").

This is the Court's ruling on the Defendants' Rule 12(b)(6) Motions to Dismiss that Complaint.

Having considered the record and the parties' arguments, the Court concludes that all claims against ZC Resource should be dismissed.

As to Athene's claimed rights to the value of the SVP Balanced Portfolio[2] upon Athene's surrender or reallocation of the Policies, such issues are unripe where Athene has failed to either surrender or reallocate. And so, the Court must dismiss

---

[2] The Court understands well that some of the terms and circumstances introduced here are unfamiliar to any reader not deeply entrenched in these transactions or this litigation. Take heart, these terms and circumstances are explained more fully below.

the claims for breach of contract as well as those for specific performance, declaratory judgment, and injunctive relief in Counts 1 and 2 related thereto.

As to the allegations concerning the reduction of death benefits paid out to Athene due to the 55% Cap, those issues are ripe and Plaintiffs have adequately pled those related claims for breach of contract, specific performance, injunctive relief, and declaratory judgment found in Counts 1 and 2. And, therefore, those claims should not be dismissed at this early stage of the litigation.

Additionally, Plaintiffs have adequately pled tortious interference against ZCRIT in Count 3.

In short, ZC Defendants' and American General's Motions to Dismiss is **GRANTED IN PART AND DENIED IN PART.**

## I. FACTUAL AND PROCEDURAL BACKGROUND[3]

In October 2000, American Investors Life Insurance Company, Inc. ("American Investors") purchased a group-variable life-insurance policy from American General (the "American Investors Policy") and paid a $100 million premium.[4] In June 2001, Indianapolis Life Insurance Company ("Indianapolis Life") purchased a substantially similar group-variable life-insurance policy from American General (the "Indianapolis Life Policy") and paid a $50 million premium.[5] The American Investors Policy and the Indianapolis Life Policy together comprise the Policies.[6] The documents and agreements evidencing and supporting the two Policies mirror each other in all material respects.[7] American Investors and Indianapolis Life merged into Athene, which owns the beneficial interest in the Policies.[8]

---

[3] Unless otherwise noted, the facts recited herein are drawn from the well-pled allegations of the Verified Complaint ("the Complaint"), together with its attached exhibits. *See* D.I. 1.

[4] Ver. Compl. ¶ 24; Ex. A.3.

[5] *Id.* ¶ 25.

[6] *Id.* ¶ 26.

[7] *Id.*

[8] *Id.* ¶ 27.

American General afforded Athene different investment options reflecting different investment philosophies and risk profiles.[9] Each investment portfolio was managed by ZC Trust.[10] ZC Resource is one of ZC Trust's trustees.[11] American General offered Athene the ability to allocate premium payments among different investment options.[12] The value of the Policies is based on the performance of the investments to which Athene allocates its cash value.[13]

The premiums paid by the policy owner are invested on its behalf, and the growth on the investments is used to pay the death benefits, which are unencumbered by income or capital gains tax, as long as appropriate strictures are followed.[14] Athene chose to invest all of the Policies' cash value in a portfolio named the SVP[15] Balanced Portfolio (the "SVP Balanced Portfolio").[16] Athene allocated the $150 million in premiums—which funded Athene's cash value in the Policies—to the

---

[9]  *Id.* ¶ 30.

[10]  *Id.*

[11]  *Id.* ¶ 21.

[12]  *Id.* ¶ 30.

[13]  *Id.* ¶ 6.

[14]  *Id.* ¶ 28.

[15]  An acronym for "stable-value protection."

[16]  Ver. Compl. ¶ 6.

SVP Balanced Portfolio.[17] That investment option was made available by American General and offered by ZC Trust.[18]

The SVP Balanced Portfolio has two components. The first is an equity and bond portfolio (the "Corresponding Portfolio").[19] The second is, as Plaintiffs describe it, a guarantee (the "SVP Product") from non-party Zurich Insurance Company ("Zurich Insurance"), and is calculated as "the difference between (i) the total value of the SVP Balanced Portfolio and (ii) the net asset value of the Corresponding Portfolio."[20]

## A. THE ORIGINAL TRANSACTION DOCUMENTS

According to the Complaint, each of the Policies was governed by six documents.[21] The five documents relevant here (the "Original Transaction Documents" or "Transaction Documents") are: (1) the Policy Document; (2) a Private Placement Memorandum from American General for the Policy; (3) an additional Private Placement Memorandum from ZC Resource; (4) a Commitment Letter from American General to Athene, and (5) a Commitment Letter from ZC

---

[17] *Id.* ¶ 29.

[18] *Id.* ¶¶ 29–30.

[19] *Id.* ¶ 31.

[20] *Id.* ¶ 31–32.

[21] *Id.* ¶ 35.

Resource to American General.[22] The Original Transaction Documents for the two policies mirror each other in all material respects.[23]

Relevant within the Original Transaction Documents is each of the American General Commitment Letters and ZCRIT Commitment Letters pledge that American General and ZCRIT, respectively, "will not modify, amend or change any of the Transaction Documents in any way which could change in any material respect the rights of the Owner and/or the terms and conditions of the transactions reflected in the [Transaction] Documents."[24]

Section 13 of each of the American General Commitment Letters also states that: first, American General is obligated to "enforce for the benefit of the Owner all of their respective rights under all of the . . . Transaction Documents"; and second, "[t]he intent of this paragraph is that [American General] will not make or agree to any changes in any Transaction Documents that would prevent the Owner from realizing in all material respects the benefits of the transactions reflected in the [Transaction] Documents."[25] Similarly, the ZC Trust Commitment Letters also provide that "[t]he intent . . . is that the Trust [ZC Trust] will not make or agree to

---

[22] *Id.*

[23] *Id.*

[24] *Id.* ¶¶ 36(d), (e).

[25] *Id.* ¶ 36(d).

- 7 -

any changes in any Transaction Documents that would prevent the Owner from realizing in all material respects the benefits of the transactions reflected in the Trust [Transaction] Documents."[26]

Under the Original Transaction Documents, the parties contemplated that the total value of the SVP Balanced Portfolio would grow at a fixed crediting rate that would be reset periodically based on a formula that would reflect market conditions and amortize the value of the SVP Product over time.[27] Under this approach, ZC Trust and Zurich Insurance established a floor crediting rate of 0% to ensure that Athene would not experience a negative return.[28] In practice, this meant that the overall value of the SVP Balanced Portfolio would not decrease over time, even in years when the market performed poorly, because Athene was guaranteed a non-negative return.[29]

The Original Transaction Documents note that federal tax law imposes certain investment-diversification requirements on life-insurance policies, including that no single investment may constitute more than 55% of a portfolio.[30] American General

---

[26] *Id.* ¶ 36(e).

[27] *Id.* ¶ 33.

[28] *Id.*

[29] *Id.*

[30] *Id.* ¶ 38.

reserved the right to manage the investments to comply with the diversification rules.[31] American General also agreed to indemnify Athene if the Policies were found to violate tax law.[32]

According to the Original Transaction Documents, Athene could exit its investment in the SVP Balanced Portfolio, either by switching to another investment portfolio offered by American General ("reallocation"),[33] or by exercising its right to "surrender" and receiving the value of its investment.[34] If Athene chose to reallocate its investment, the value of the SVP Balanced Portfolio would be reallocated over four years, through five installments, to another investment portfolio.[35] If Athene chose to "surrender" its Policies, American General promised to repay Athene as soon as possible after receiving a demand for surrender from Athene, while reserving the ability to delay payment for the lesser of six months or a period permitted by law.[36]

---

[31] *Id.*

[32] *Id.*

[33] *Id.* ¶ 11(i).

[34] *Id.* ¶ 11(ii)

[35] *Id.* ¶ 39(a).

[36] *Id.* ¶ 39(b).

## B. THE RESTATED TRANSACTION DOCUMENTS

In 2001, after Athene notified American General of its intent to surrender the policies, the parties agreed to amend several material aspects of the Transaction Documents.[37] First, American General and ZC Trust changed the minimum crediting rate of the SVP Balanced Sub–Portfolios from 0% to 8% and implemented a maximum crediting rate of 10%.[38] Second, American General advised Athene that Zurich Insurance would contribute $15.6 million to the securities portfolio, while Athene made an additional premium payment—that is, an additional investment— of $30 million.[39] The 2001 Amendments also altered the Policies' surrender protocol.[40] Specifically, the parties agreed to a "Special Surrender Protocol."[41] Whereas, prior to this amendment, American General could defer payment for a maximum of six months, under the Special Surrender Protocol, American General acquired the "sole discretion" to determine the timing of payment after receiving Athene's notice of intent to surrender.[42]

---

[37] *Id.* ¶¶ 41, 44.

[38] *Id.* ¶ 44.

[39] *Id.* ¶¶ 46–47.

[40] *Id.* ¶ 8.

[41] Defs' Op. Br. at 3.

[42] *Compare* Ver. Compl. ¶ 39(b) (six months), *with* Ver. Compl., Ex. B.2 (Restated ZCRIT Investment PPM) at 29-30 ("sole discretion").

In connection with this agreement, certain transaction documents were amended and restated in December 2001 (for the American Investors Policy) and in January 2002 (for the Indianapolis Life Policy) (collectively, the "Restated Transaction Documents"), with American General delivering to Athene the Restated Policy PPMs, and ZC Trust delivering to Athene the Restated Investment PPMs.[43] Both American General and ZC Trust acknowledged in the Restated Policy PPMs and the Restated Investment PPMs, respectively, that Athene made its decision to retain the Policies and its investment in the SVP Balanced Portfolio in reliance on the revised deal terms set forth in the Restated Policy PPMs and the Restated Investment PPMs, respectively.[44]

## C. THE 2011 SUPPLEMENTS

Between 2001 and 2011, the Corresponding Portfolio materially underperformed the guaranteed minimum crediting rate of 8% and the obligation under the SVP Product grew dramatically.[45] As a result of this poor performance of the Corresponding Portfolio and the application of the 8% minimum crediting rate, the SVP Product became a larger portion of the SVP Balanced Portfolio, reaching nearly $169 million as of the date of the Complaint.[46] The Defendants explain that,

---

[43]  *Id.* ¶ 48.

[44]  *Id.* ¶ 50.

[45]  *Id.* ¶¶ 74–75.

in the fall of 2011, due to the widening gap between the 8% minimum crediting rate and the lower-yield performance of the securities portfolio, "the value of the SVP Product neared 55% of the value of the assets of the SVP Balanced Sub-Portfolios, consisting of the securities in the Corresponding Portfolio and the SVP Product."[47]

In December 2011, the Defendants issued draft supplements to the transaction's private placement memoranda that instituted a "55% Cap" on the value of the SVP Product (the "55% Cap") and amended the Surrender Protocol by providing that American General will pay the cash surrender value once the SVP Product's value amortizes to zero (together with the 55% Cap, the "2011 Supplements").[48] Despite Athene's objections, American General did not withdraw the 2011 Supplements and on January 11, 2012, Benefit Finance Partners, LLC, the administrator of the policies, advised Athene that Defendants considered these amendments to be in effect and have since administered the Policies as though in effect.[49]

---

[46] *Id.*

[47] Defs' Op. Br. at 16.

[48] Ver. Compl. ¶ 13, 54-56; Ex. C.2 at 2.

[49] *Id.* ¶ 86.

## D. RELEVANT REVENUE RULES AND REGULATIONS

As variable life insurance contracts, the Policies are entitled to significant tax advantages. To receive these benefits, however, each Policy must qualify as a "life insurance contract" under § 7702 of the Internal Revenue Code ("IRC").[50] If either Policy were to become non-compliant, its favorable tax status would be lost.[51]

To maintain this status, the Policies must remain compliant with the diversification rules found in IRC § 817(h) and in § 1.817–5 of the Treasury Regulations.[52] Under the IRC's diversification rules, to maintain "life insurance contract" status, the investments of a segregated asset account must remain adequately diversified.[53] Under § 1.817–5(b)(1), the investments of a segregated asset account are sufficiently diversified if "[n]o more than 55% of the value of the total assets of the account is represented by any one investment . . . ."[54]

In § 1.817–5(d), the IRS outlines a market fluctuations safe harbor. Under the market fluctuation rule, an account does not violate the diversification requirement

---

[50] *See* 26 U.S.C. § 7702.

[51] Ver. Compl., Ex. B.1 (Restated American General Policy PPM) at 36-37; Defs' Op. Br. at 7.

[52] Ver. Compl., Ex. B.2 (2001 Restated ZCRIT Investment PPM) at 44; *see* 26 U.S.C. § 817; 26 C.F.R. § 1.817–5.

[53] Defs' Op. Br. at 7.

[54] Treas. Reg. § 1.817-5(b)(1)(i)(A).

"unless such discrepancy exists immediately after the acquisition of any asset and such discrepancy is wholly or partly the result of such acquisition."[55] Athene contends that this rule applies to fluctuations in the value of the SVP Product and, thus, that Defendants' application of the 55% Cap to the SVP Product is unnecessary.[56]

In March 2016, Athene asked the IRS for a private-letter ruling on the diversification requirements' application to the Policies.[57] Athene's request to the IRS sought confirmation that the SVP Product's increase to 55% of the value of the SVP Balanced Portfolio would not violate federal regulations because such an occurrence would arise from the market performance of the Corresponding Portfolio.[58] Athene also requested that the IRS confirm that this occurrence would not disqualify the Policies as life insurance contracts for purposes of federal-income tax.[59]

---

[55]    26 C.F.R. § 1.817- 5(d).

[56]    Plfs' Ans. Br. at 51.

[57]    Ver. Compl. ¶ 69.

[58]    *Id.* ¶ 70.

[59]    *Id.*

Athene asserted that under the market-fluctuation rule, a violation of the diversification requirements can result only from the acquisition of an asset.[60] Applying that rule, Athene explained that any increase in the SVP Product over 55% would result from changes in the values of the assets in the SVP Balanced Portfolio because of market performance and the 8% crediting rate, not from the acquisition of any asset.[61] Athene later submitted a supplemental letter to the IRS in January 2017.[62]

By letter on March 1, 2017, the IRS declined to provide Athene's requested private-letter ruling.[63] The IRS neither agreed nor disagreed with Athene's position, but informed Athene that: (i) with respect to the Indianapolis Life Policy, Athene "had already taken a return position on the tax effect of the market performance," and (ii) with respect to the American Life Policy, the general advice sought would not be provided in "the interest of sound tax administration."[64]

---

[60] *Id.*

[61] *Id.*

[62] *Id.*

[63] *Id.* ¶ 71.

[64] *Id.*

## E. THE *AVIVA* ACTION

This is not the parties' first attempt to judicially resolve this policy dispute. The *Aviva Life and Annuity Co. v. American General Life Insurance Co.* Court of Chancery action ("*Aviva* Action") focused on the same contractual relationship between Defendants and Plaintiffs' predecessors.[65]

In March 2013, Plaintiffs' predecessors brought the *Aviva* Action in response to the Policies' 2011 Supplements. They sought, among other things, declaratory judgment that the implementation of the 55% Cap and the change to Athene's surrender rights were invalid. On cross-motions for judgment on the pleadings, the Vice Chancellor dismissed the claims without prejudice, reasoning that the claims were not yet ripe, because any limit on the 55% Cap was only theoretical.[66]

The 55% Cap has since been implicated, and as a result, the value of a single death benefit paid under the Policies was reduced by approximately $9,000.[67] In October 2019, the Plaintiffs filed this action in the Court of Chancery, arguing that

---

[65] *See Aviva Life and Annuity Co. v. American General Life Insurance Co.*, 2014 WL 1677798 (Del. Ch. Apr. 29, 2014). Plaintiff Athene Life and Annuity Company was then known as Aviva Life and Annuity Company. Ver. Compl. ¶ 16. Plaintiffs American Investors Life Insurance Company, Inc. Revocable Trust and Indianapolis Life Insurance Company Revocable Trust were represented by their trustee, U.S Bank Trust National Association, in the previous litigation. *See id.* at *1.

[66] *Id.* at *6.

[67] Ver. Compl. ¶ 4.

- 16 -

all of their claims have now ripened.[68] The Court of Chancery ruled that it lacks subject matter jurisdiction over the Complaint, finding that while on its face the Complaint seeks equitable relief, an adequate remedy at law exists.[69] And so, Plaintiffs exercised their statutory option to have their case transferred here.[70]

## II. PARTIES' CONTENTIONS

### A. PLAINTIFFS' CLAIMS

Plaintiffs set forth three counts in their Complaint. In "Count 1" of the Complaint, Plaintiffs bring a claim for breach of contract.[71] They argue that American General lacked the contractual authority to amend the Original Transaction Documents and Restated Transaction Documents by imposing the 2011 Supplements, and that in doing so, American General breached its contract with the Plaintiffs.

In "Count 2" of the Complaint, Plaintiffs seek declaratory judgments that Defendants' unilateral implementation of the 2011 Supplements harm Athene and violate Athene's rights under the Original Transaction Documents and Restated

---

[68] *See Athene Life and Annuity Co. v. American General Life Insurance Co.*, 2019 WL 3451376, at *12 (Del. Ch. July 31, 2019).

[69] *Id.* at *12.

[70] *See* DEL. CODE ANN. tit. 10, § 1902 (2019).

[71] Ver. Compl. ¶¶ 87–97.

- 17 -

Transaction Documents by (i) reducing or eliminating Athene's 8% guaranteed return, (ii) improperly employing the 55% Cap and unreasonably applying that cap, including with respect to reallocation, and (iii) removing the protocol for Athene to access the full value of the SVP Product upon surrender of the Policies.[72] Alternatively, Plaintiffs ask for declaratory judgment that the Defendants' unilateral implementation of the 55% Cap to impair Athene's and the Trusts' ability to obtain the benefit of the SVP Product is an invalid exercise of their rights under either the Original Transaction Documents or the Restated Transaction Documents.[73] Additionally, Plaintiffs seek an injunction enjoining Defendants from taking any action inconsistent with the declaration.[74]

In "Count 3" of the Complaint, Plaintiffs seek monetary damages for tortious interference of contract against ZCRIT and ZC Resource and also seek equitable relief in the form of "injunctive relief from further interference by ZCRIT and ZC Resource."[75]

---

[72]  *Id.* ¶ 104(a)–(b).

[73]  *Id.* ¶ 105.

[74]  *Id.* ¶ 106.

[75]  *Id.* ¶ 107–112.

In their answering brief to Defendants' Motion to Dismiss, Plaintiffs contend that all of the claims are ripe given four key developments since Athene's 2013 action:

(i)    Defendants' undisputed implementation of the 55% Cap to reduce the growth of the SVP Product;

(ii)    Defendants' undisputed implementation of the 55% Cap to decrease the value of a death benefit paid to Athene by approximately $9,000;

(iii)    the IRS declining to provide any guidance concerning the purported need for the 55% Cap; and

(iv)    Athene's inability to resolve this matter with Defendants to obtain the clarity it needs to protect its rights under the Restated Transaction Documents; instead, Defendants confirmed that they intend the 2011 Supplements to eviscerate the value of the SVP Product.[76]

## B. THE DEFENDANTS' MOTIONS

Defendants collectively, via motion and joinder, seek wholesale dismissal of the Complaint. As for Counts 1 and 2, the Defendants do not dispute that both the breach-of-contract and declaratory judgement claims concerning the reduced benefits paid to Athene due to the 55% Cap are now ripe. They argue that the claims lack merit. The Defendants claim the 55% Cap is necessary to comply with tax regulations and, therefore, to preserve the tax-favored status of the Policies.[77]

---

[76] Plfs' Ans. Br. at 20–21.

[77] Defs' Op. Br. at 5.

Moreover, Defendants' position is that no benefit has actually been denied to Plaintiffs because the SVP Product has no real value, but is instead an accounting device to smooth returns in the Portfolio over time.[78] They contend that the 55% Cap was required to preserve the tax-advantaged status.

Defendants argue that the breach-of-contract and declaratory judgment claims concerning the amendments to the Surrender Protocol in the 2011 Supplements are both unripe and lack merit. Defendants suggest that Athene's Surrender Protocol Claims in Counts 1 and 2 are not ripe because Athene has not provided notice of intent to surrender the Policies. Furthermore, Defendants say that even if Athene's claims are ripe, the 2011 Supplements did not alter Athene's Surrender Rights under the Original Transaction Documents and Restated Transaction Documents. Defendants claim that they were expressly given authority to unilaterally amend the Surrender Protocol through the "sole discretion" on timing provision in the private placement memoranda for the Policies that were amended and restated in 2001.[79]

As to Count 3—that for tortious interference with contract—Defendants argue it should be dismissed because Athene fails to allege an actual breach of contract by American General, which is an essential element of its tortious interference claim. Moreover, Defendants contend that under Delaware law, it is well-settled that a

---

[78]  *Id.* at 2.

[79]  *Id.* at 4.

- 20 -

defendant may only be found liable for tortious interference if it is a stranger to the contractual relationship. Here, Defendants claim that it is clear on the face of the Complaint that ZCRIT and ZC Resource were fundamental to the implementation of the contracts' terms and, in particular, to the creation and management of Athene's investment portfolio. In addition, Defendants claim that the "interference privilege" recognized by Delaware courts also bars Athene's recovery because Athene has not disputed that the ZC Defendants were acting in American General's interests when they effectuated the 55% Cap.

Finally, Defendants assert that under Delaware law, ZC Resource, in its capacity as former trustee of ZCRIT, cannot be liable to Athene, a non-shareholder, for damages arising from its alleged conduct as trustee.

## III. STANDARD OF REVIEW

The standard of review on these Defendants' motions to dismiss is derived from Superior Court Civil Rule 12(b)(6), which provides that a defendant may bring a motion to dismiss if a complaint fails "to state a claim upon which relief can be granted."[80] When considering a motion to dismiss, the Court must:

    (1)   accept all well pleaded factual allegations as true,

    (2)   accept even vague allegations as "well pleaded" if they give the opposing party notice of the claim,

---

[80]   Del. Super. Ct. Civ. R. 12(b)(6).

- 21 -

(3) draw all reasonable inferences in favor of the non-moving party, and

(4) not dismiss the claims unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[81]

However, the Court "is not required to accept every strained interpretation of the allegations proposed by the plaintiff."[82] The Court should "ignore conclusory allegations that lack specific supporting factual allegations."[83] The Court also may not consider extrinsic materials on a motion to dismiss except "where an extrinsic document is integral to a plaintiff's claim and is incorporated into the complaint by reference."[84]

Dismissal is warranted when a plaintiff either fails to plead facts supporting an element of its claim, or where under no reasonable interpretation of the facts alleged could its complaint be read to state a claim for which relief might be

---

[81] *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).

[82] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

[83] *Anderson v. Tingle*, 2011 WL 3654531, at *2 (Del. Super. Ct. Aug. 15, 2011) (quoting *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998)).

[84] *Furman v. Delaware Dep't of Transp.*, 30 A.3d 771, 774 (Del. 2011); *see also Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013); *Price v. Koski Trucking, Inc.*, 2012 WL 3549729, at *2 (Del. Super. Ct. July 27, 2012); *Capano v. Lockwood*, 2015 WL 5178388, at *2 (Del. Super. Ct. Aug. 21, 2015).

- 22 -

granted.[85] If the Court engages these well-accepted standards and finds the claimant may recover, the Court must deny the motion to dismiss.[86]

## IV. DISCUSSION

There are only three matters in dispute: (1) whether ZC Resource is personally liable to the Plaintiffs under the Delaware Statutory Trust Act; (2) are the issues presented ripe for judicial resolution; and (3) do Plaintiffs adequately plead claims for breach of contract, specific performance, injunctive relief, declaratory judgment, and tortious interference.

### A. CLAIMS AGAINST ZC RESOURCE

All of the claims asserted against ZC Resource must be dismissed. Under the Delaware Statutory Trust Act, "a trustee, when acting in such capacity, shall not be personally liable to any person other than the statutory trust or a beneficial owner for any act, omission or obligation of the statutory trust or any trustee thereof" except "to the extent otherwise provided" by the trust's governing document.[87]

Here, the ZCRIT Declaration of Trust does not "otherwise provide."[88] It explicitly provides that the trustee "shall not be liable for any act or omission of any

---

[85] *Otto's Candies, LLC v. KPMG, LLP*, 2018 WL 1960344, at *3 (Del. Super. Ct. Apr. 25, 2018).

[86] *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978).

[87] DEL. CODE ANN. tit. 12, § 3803(b) (2019).

[88] Defs' Reply at 57.

- 23 -

conduct whatsoever in his capacity as Trustee . . . ."[89] The only exception is potential

liability to the trust or shareholders, which is not applicable here. Accordingly,

Athene, a holder of the Policies and not a shareholder of ZCRIT, cannot recover

damages from ZC Resource for any act or omission, including alleged tortious

interference, as a matter of law.

Furthermore, the Complaint lacks any allegation that ZC Resource acted

outside the scope of its authority as trustee. In fact, the Complaint concedes that ZC

Trust and ZC Resource argued that the 55% Cap was required in order to comply

with IRS diversification requirements for life-insurance accounts.[90] Plaintiffs only

allege that ZC Resource unilaterally implemented the Policy Supplements with

knowledge of the terms of the Original Transaction Documents and the Restated

Transaction Documents. Even if it were a plausible inference that ZC Resource was

acting in part with erroneous or adverse motives, this does not necessarily lead to

the conclusion that it acted outside the scope of its authority—a conclusion necessary

for the imposing personal liability in tort for interfering with the contractual rights

of Athene.[91] To hold otherwise would substantially curtail ZC Resource's ability to

carry out its duties due to the fear of culpability. Because there are no facts showing

---

[89] *See* Affidavit of Joel Friedlander, Ex. 8 (ZCRIT Declaration of Trust) at § 10.1.
[90] Ver. Compl. ¶ 110.

[91] *See Feldman v. Soon-Shiong*, 2018 WL 2124063, at *4 (Del. Ch. May 8, 2018).

- 24 -

that ZC Resource exceeded its capacity as trustee, it appears with reasonable certainty that the Plaintiffs would not be entitled to relief against ZC Resource under any set of facts that can be inferred from the pleadings. Therefore, all claims against ZC Resource must be dismissed.

## B. RIPENESS

Under the Declaratory Judgment Act, this Court has the "power to declare rights, status and other legal relations whether or not further relief is or could be claimed."[92] The purpose of a declaratory judgment is "to promote preventive justice […] where an injury has not yet occurred."[93]

The decision to issue a declaratory judgment is within the Court's discretion.[94] And the discretion to assume, or not to assume the jurisdiction lies fully with the Court—"the only limitation being that the Court cannot abuse its discretion."[95] But

---

[92] DEL. CODE ANN. tit. 10, § 6501 (2019).

[93] *Lamourine v. Mazda Motor of Am., Inc.*, 2006 WL 2767021, at *3 (Del. Super. Ct. Aug. 28, 2006). *See also Bank of Delaware v. Allstate Ins. Co.*, 448 A.2d 231, 234 (Del. Super. Ct. 1982) (citing *Clemente v. Greyhound Corporation*, 155 A.2d 316, 320 (Del. Super. Ct. 1959) ("[T]he principal reason for the invention of the declaratory judgment procedure was to enable the law of a case to be determined before mere differences ripen into actual injuries.")).

[94] *XL Specialty Ins. Co. v. WMI Liquidating Trust*, 93 A.3d 1208, 1216 (Del. 2014) (citing *Gannett Co., Inc. v. Bd. of Managers of the Delaware Criminal Justice Info. Sys.*, 840 A.2d 1232, 1237 (Del. 2003) ("This Court reviews for abuse of discretion the Superior Court's decision to exercise declaratory judgment jurisdiction over a case.")).

[95] *See Clemente*, 155 A.2d at 321; *Burris v. Cross*, 583 A.2d 1364, 1372 (Del. Super. Ct. 1990); *Mr. Kleen, LLC v. New Castle County Dep't of Special Servs.*, 2014 WL 4243562, at *7 (Del. Super. Ct. Aug. 19, 2014).

the Court may not exercise that discretion "unless the action presents an actual controversy."[96]

Our Supreme Court "has emphasized that the declaratory judgment statute must not be used as a means to elicit advisory opinions from the courts."[97] For this Court to grant declaratory relief, "[a] litigant need not have suffered actual harm, but an actual controversy must exist so that judicial resources are not wasted on hypothetical disputes or on situations in which a judicial declaration will not end the dispute between the parties."[98] To present an actual controversy, the disputed issue must be, among other things, ripe for adjudication.[99] "The ripeness doctrine reflects two goals: first, to conserve judicial resources by not allocating them to resolution of disputes that are not ready for judicial disposition, and, second, to avoid the development of the law in the absence of concrete facts and adversary positions upon which case law is premised."[100]

---

[96] *XL Specialty Ins.*, 93 A.3d at 1216 (internal quotation omitted); *see also Stroud v. Milliken Enterprises, Inc.*, 552 A.2d 476, 479 (Del. 1989).

[97] *Energy Partners, Ltd. v. Stone Energy Corp.*, 2006 WL 2947483, at *7 (Del. Ch. Oct. 11, 2006).

[98] *Hoechst Celanese Corp. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 623 A.2d 1133, 1137 (Del. Super. Ct. 1992).

[99] *See XL Specialty Ins.*, 93 A.3d at 1216–17.

[100] *Tenneco Automotive Inc. v. El Paso Corp.*, 2001 WL 1641744, at *6 (Del. Ch. Nov. 29, 2001).

With this backdrop, the Court turns to the declaratory judgment issues here: (i) the 55% Cap, (ii) the Special Surrender Protocol, and (iii) Reallocation Rights.

**1. The 55% Cap**

The 2011 Supplements establish a cap so that the value of the SVP Product does not exceed 55% of the aggregate value of the SVP Balanced Sub–Portfolio. If this 55% Cap is reached, the SVP Product value and, correspondingly, the value of the SVP Balanced Sub–Portfolio, will be adjusted automatically. This dispute is over whether this 55% Cap was required to preserve tax-advantaged status.

Plaintiffs allege "Defendants asserted an erroneous interpretation of federal tax rules to purport to impose a "cap" on the value of the SVP Product." The issue involves, in part, a question of federal law under the Internal Revenue Code that is of first impression. The Court need not answer this factually intensive question at such an early stage of this current action. Accepting all well-pleaded factual allegations as true, the claims for breach of contract and declaratory judgment concerning the reduction of benefits paid as result of the 55% Cap survive the motion to dismiss. Still, the issue of whether the 55% Cap wrongfully reduced the value of the SVP product and thus the amount that would be paid upon surrender is still unripe.

## 2. The Surrender Protocol

The first way for Athene to exit the policies is through surrender. Plaintiffs contend that its rights upon surrender were hindered by the 2011 Supplements providing (1) the 55% Cap and (2) that American General will pay the cash surrender value once the SVP Product's value amortizes to zero. Despite the recent developments alleged by Plaintiffs, the holdings of from the *Aviva* Action still apply to the claims implicating the Surrender Protocol.

In the *Aviva* Action, the Vice Chancellor explained how the claims were unripe by itemizing the following findings of law and assumptions of fact that would have to be entertained to reach a decision:

> Find that the SVP Product provides Aviva with an economic return after surrender if the book value of the Sub–Portfolio exceeds its market value; assume that Aviva will choose to surrender the Policies when such a scenario exists; further assume that market conditions would be such that, if [American General] were to delay payment, post-surrender, until full amortization of the value of the SVP Product, such an amortization period would be protracted; and, under that assumption, then find that such a protracted withholding of Aviva's investment would constitute a material impairment of Aviva's rights under the Policies and breach the implied covenant of good faith and fair dealing, notwithstanding [American General's] bargained-for right to time such payment in its "sole discretion." At this stage, the requested determination that the change from a "sole discretion" term to a provision requiring the value of the SVP Product be zero before payment, and from the Barclays Capital Aggregate Bond Index to the federal funds rate, harms Aviva's interests in a material way such that this amendment violates the Transaction Documents, and also constitutes a breach of the implied covenant, would be unduly speculative. This is true even assuming that Aviva will,

eventually, wish to exercise its surrender right, as such a determination would be contingent on factors only knowable at the time of surrender, like the value of the SVP Product, how long it would take to amortize that amount, and what rate is to be applied.[101]

In other words, because the circumstances at the time of surrender cannot be known, it would necessitate speculation, not just about whether a surrender will occur, but, if so, about what the conditions *may* be and what impact they *may* have on Aviva's interests in the Policies upon surrender. Not surprisingly, my colleague found such an opinion would be hypothetical and advisory.

None of the four key developments since Athene's 2013 action change the Court of Chancery's analysis. In their answering brief, Plaintiffs contend that all claims implicate the 55% Cap and thus should be heard together. Plaintiffs have failed to demonstrate how the developments implicating the 55% Cap should distinguish this from the Court of Chancery's decision. For instance, the Court would still have to find that the SVP Product provides Athene with an economic return after surrender if the book value of the Sub-Portfolio exceeds in market value.

The Plaintiffs argue that judicial economy is served by addressing Athene's claims relating to the 55% Cap together. Yet, this misconstrues the actual concept of ripeness and its crucial nature in defining a court's role. "Ripeness, the simple question of whether a suit has been brought at the correct time, goes to the very heart

---

[101] *Aviva Life & Annuity Co.*, 2014 WL 1677798, at *13.

- 29 -

of whether a court has subject matter jurisdiction."[102] As Defendants point out, there appears little overlap between the Surrender Protocol and the 55% Cap. And as they also correctly contend, a claim cannot ripen on mere efficiency grounds.[103]

No doubt, from any litigant's perspective having some judicial voice weigh in on an issue prior to acting would always be preferable and may promote one's efficient ordering of one's affairs. But the issue of ripeness goes directly to a court's jurisdiction, and thus its power to hear a claim.[104] In analyzing whether a claim is ripe, the efficiency concern is to conserve judicial resources by not allocating them to resolution of disputes that are not ready for judicial disposition.[105] Delaware courts do consider "whether the interests of those who seek relief outweigh the interests of the court and of justice in postponing review until the question arises in some more concrete and final form."[106]

Here, Plaintiffs have not plead facts sufficient to demonstrate that these specific claims are ready for judicial disposition. Ripeness is analyzed on a claim-

---

[102] *Bebchuk v. CA, Inc.*, 902 A.2d 737, 740 (Del. Ch. 2006).

[103] Defs' Reply at 7.

[104] *See Bebchuk*, 902 A.2d at 740 ("Because of its importance, ripeness is a doctrine common to both federal and state courts.").

[105] *Schick Inc. v. Amalgamated Clothing and Textile Workers Union*, 533 A.2d 1235, 1239 (Del. Ch. 1987).

[106] *Bebchuk*, 902 A.2d at 740 (citation and internal quotations omitted).

by-claim basis.[107] And the Court finds that its interest in deferring any consideration of the issues until there are more concrete facts outweighs Athene's interest in a decision on these issues.

As the Court of Chancery observed in the *Aviva* Action before: Athene is a sophisticated party that negotiated a contract with a "sole discretion" term and now is seeking a judicial determination as to the meaning of the Policies based on facts that are not yet fully developed.[108] In the absence of a ripe dispute, this Court may not presently make such a determination. But if Athene does surrender these corporate-owned life insurance policies, then it can easily approach this Court for a determination as to the validity of the Special Surrender Protocol at that time, if appropriate.[109]

### 3. Reallocation Rights

The second way for Athene to exit the policies is through reallocation. With respect to "reallocation," at the conclusion of a 36-month Restriction Period (which has already expired), Athene can direct that American General reallocate all or a

---

[107] *Brownsburg Area Patrons Affecting Change v. Baldwin*, 943 F. Supp. 975, 992 (S.D. Ind. 1996) (citing *Pacific Gas and Elec. Co. v. State Energy Resources Conservation & Development Comm'n*, 461 U.S. 190, 200 (1983) (Utilities' challenge to one provision in California state statute was ripe, but challenge to another provision was not.)).

[108] *See Aviva Life and Annuity Co.*, 2014 WL 1677798, at *13.

[109] *See id.*

portion of its investment from the SVP Balanced Portfolio to another investment opportunity.[110] Under the Investment PPM, the value of the SVP Balanced Portfolio would then be reallocated in five installments over four years, with a certain percentage of the investment value redeemed and reallocated each year.[111] Upon Athene's exercise of its reallocation rights, Defendants have stated that they would implement this process by redeeming the Corresponding Portfolio before the SVP Product.[112] This practice, employed in concert with the 55% Cap, meant that any reallocation of the Corresponding Portfolio would require a concomitant reduction in the value of the SVP Product, which could never comprise more than 55% of the total value of the SVP Balanced Portfolio.[113] Athene contends that such an action would preclude Athene from realizing any value of the SVP Product.[114] Athene argues that it is entitled to a declaratory judgment so that it may "evaluate the value of its investments and the economic consequences of reallocation."[115]

---

[110] *See* Ver. Compl. 39(a); Exs. A.3, A.5 (Appendix I, Example A).

[111] *Id.* ¶ 55(b).

[112] *Id.* ¶ 55(b).

[113] *Id.* ¶ 12.

[114] *Id.* ¶ 55(b).

[115] *Id.* ¶ 100.

This Court (as did its sister court before) has already ruled that Athene's interests in evaluating its "ongoing choice[s]" is clearly outweighed by the "uncertainty, waste of resources, and advisory nature of any decision on the merits."[116] Similar to the surrender protocol claims, the claims in Counts 1 and 2 asserting that application of the 55% Cap hinders Athene's ability to access the full value of the SVP Balanced Portfolio through reallocation are not ripe for judicial determination.

## C. TORTIOUS INTERFERENCE WITH CONTRACT

One states a claim for tortious interference with contractual relations by pleading: (1) a valid contract; (2) about which defendants knew; (3) an intentional act that is a significant factor in causing the breach of such contract; (4) without justification; (5) which causes injury.[117]

ZC Defendants have argued that Plaintiffs fail to state a claim for tortious interference because of the "stranger rule." Under this rule, the complaint must allege facts supporting a reasonable inference that the defendant is "'a stranger to

---

[116] *See Aviva Life and Annuity Co.*, 2014 WL 1677798, at *12.

[117] *Aspen Advisors LLC v. United Artists Theatre Co.*, 861 A.2d 1251, 1265-55 (Del. 2004) (Recounting Delaware law's five well-established elements of a tortious interference claim.).

both the contract and the business relationship giving rise to and underpinning the contract.'"[118]

The Delaware Court of Chancery has recently departed from the stranger rule enunciated in *Tenneco*, finding that "[t]he *Tenneco* decision . . . did not have to consider the broader implications of applying the stranger rule" because the defendant had become an actual party to the insurance policies at issue in the tortious interference claim.[119] The Chancery Court further noted, "[s]ubsequent decisions of this court have quoted language from *Tenneco* without examining these issues."[120]

*In Bandera Master Fund LP v. Boardwalk Pipeline Partners, LP*, the Delaware Court of Chancery found the *Tenneco* stranger rule runs contrary to the Delaware Supreme Court's adoption of the multi-factor balancing approach under Section 766 of the Second Restatement of Torts.[121] And the *Bandera* court observed that the *Tenneco* decision had derived its articulation of the stranger rule from a Georgia case.[122]

---

[118] *Tenneco Automotive*, 2007 WL 92621, at *5 (quoting *Atlanta Market Ctr. Mgmt., Co. v. McLane*, 503 S.E.2d 278, 283 (Ga. 1998)).

[119] *Bandera Master Fund LP v. Boardwalk Pipeline Partners, LP*, 2019 WL 4927053, at *28 (Del. Ch. Oct. 7, 2019).

[120] *Id.*

[121] *Id.*

[122] *See Tenneco Automotive*, 2007 WL 92621, at *5 (quoting *Atlanta Market Ctr. Mgmt., Co. v. McLane*, 503 S.E.2d 278, 283-84 (Ga. 1998)).

Georgia is part of a competing group of jurisdictions that have adopted an absolute (rather than limited) affiliate privilege.[123] According to this theory, "a parent and its wholly owned subsidiaries constitute a single economic unit."[124] By contrast, jurisdictions like Delaware recognize a limited affiliate privilege and employ "'a balancing test of the kind elaborated in the Restatement (Second) of Torts.'"[125] The latter approach acknowledges "the significant economic interest of a parent corporation in its subsidiary" but does so without foreclosing potential liability on the sole basis of related-party status.[126] The *Bandera* court noted that when applying the stranger rule, the *Tenneco* court did not explore these differences. And, most importantly, the *Bandera* court recognized that contrary to what *Tenneco* might have suggested: "It does not follow, however, that the defendant must also be a stranger to the 'the business relationship giving rise to and underpinning the contract' to qualify as a 'third party' for purposes of Section 766."[127] This Court agrees.

---

[123] *Bandera Master Fund*, 2019 WL 4927053, at *27.

[124] *Shearin v. E.F. Hutton Group, Inc.*, 652 A.2d 578, 590 (Del. Ch. 1994).

[125] *Bandera Master Fund*, 2019 WL 4927053, at *28 (quoting *Shearin*, 652 A.2d at 590).

[126] *Id.*

[127] *Id.*; *see also* RESTATEMENT (SECOND) OF TORTS § 766 (1979).

Under Section 766's multi-factor balancing approach, ZC Defendants' argument that ZCRIT could not tortiously interfere merely because it was not a complete stranger to the business relationship fails. As mentioned, the policies unpinning Delaware's limited affiliate privilege focus primarily on balancing corporate separateness and preserving a parent entity's ability to protect its economic interest in its subsidiaries.[128] Those same concerns are not at stake with the relationship between the ZCRIT and American General.

Lastly, ZC Defendants assert this tortious interference claim fails because there is no breach of contract. The Court simply cannot—on the record developed at this early pleading stage—determine whether a breach has actually occurred. And under the facts alleged in the Complaint and the reasonable inferences drawn from those facts, the Court simply cannot say there is no reasonable conceivability that Plaintiffs might be able to obtain recovery on their claim that ZCRIT tortiously interfered in causing a breach if the 55% Cap is found to be a breach of contract that reduced the policy benefits paid out.

---

[128] *Id.*

## V. CONCLUSION

ZC Defendants' and American General's Motions to Dismiss is hereby **GRANTED** as to all claims against ZC Resource and the claims in Counts 1 and 2 against American General and ZCRIT implicating the Surrender Protocol and the Reallocation Rights. But it is **DENIED** as to the claims in Counts 1 and 2 against American General and ZCRIT implicating the reduced death benefits paid due to the 55% Cap and the tortious interference claim (Count 3) against ZCRIT.

**IT IS SO ORDERED.**

Paul R. Wallace, Judge

Original to Prothonotary,

cc:    All Counsel via File and Serve